Welcome to our report. Before we begin, just two preliminary matters. Most of you have heard this before and some of you have been before us this week. But for those of you sort of unfamiliar with our procedures, you will notice our clock system, our timing system, there's a clock that keeps count of how much time you have and what's left, and there's a lighting system. Green means, of course, you may proceed. Yellow is a two-minute warning. Red means that your time is up. One of my colleagues was sort of fond of saying that the red light was not aspirational. I simply raise it with you. I don't mean to say that you've got to stop dead in the middle of a sentence or a thought, but when that red light goes on, if you could bring your remarks to a conclusion, we would be much appreciative. Second observation for you, as you proceed with your arguments, you can safely assume we've had a chance to review the briefs, the record excerpts, and in some instances, we've had a chance to review the record itself. So you really can go to the heart of your argument as you proceed. I know that your time is short. And with that, we will proceed with the first case, which is the United States versus Maduro, Oscarra, Acosta, et al. Good morning, Your Honors. Good morning. My name is Edward Lee Bling. I'm here on behalf of Arlie Lopez and CISO. May you please support counsel? To get right to the matter in this case, this is a four-code offense tried in the lower court, Mr. and CISO one of the four. I was trial counsel at that time in this case. The issue I would like to get right to the nub is the polygraph examination that was permitted for one of these four co-defendants in Addis Angulo, Oscarra. This is a situation, true case of first impression. There is no known case law anywhere in this country that a multi-defendant trial would allow or have one defendant produce, have admitted, a polygraph examination. In this particular case, I would posit to the court, argue to the court, that Mr. and CISO suffered substantial prejudice in the following way. When a polygraph examination was admitted against, for one co-defendant and you have three others sitting there in a jury setting, this was something that you cannot overcome because we did not have one. Mr. Lopez did not have one. I can say in this particular matter, the judge herself in the lower court made note. This was a novel issue, an unusual issue, quote, unquote, on both of those terms. I twice moved... I'll just give you a chance to respond to what I understand the government's argument is. They say, well, in the end, Mr. Angulo, forgive my faltering, was convicted anyway. So, you know, it didn't help him, so it didn't hurt your client. I'm sure they'll say it better than I did, but how do you respond to that in terms of prejudice? A hundred jury trials at the trial level, in my experience, the briefs cannot impart what it's like to be in the courtroom during a jury trial. Jurors cannot help but speculate, wonder, this man has a polygraph examination and if he went down in flames in his case and rejected him, even with the polygraph, what hope did my client have? Why didn't he have a polygraph? I think the thrust of the question Judge Barton is asking is if the polygraph evidence, which after all was exculpatory, not inculpatory in nature, did not in the eyes of the jury exculpate the defendant who was offering it, how can you assert prejudice on the part of others about whom the polygraph had no basis? They didn't believe, but they gave no credence to the polygraph offered by the co-defendant. That's precisely the problem. The polygraph has some mystique in this country. That's why most state and federal courts don't even permit it. In a situation like this, if he had one and he went down because he testified, what hope do the other fellows have? That is to say, did we put that man up to have a polygraph because he could pass it? Why didn't we do it because he could not pass it? My client could not pass a polygraph examination. We didn't even bother because we couldn't even get to that level. It can only be speculation in a jury's mind. Help me with this because when we look at this question of joinder and severance, we've said it's a general matter, and the rules say it's a general matter. Defendants tried together in the same conspiracy ought for a variety of reasons to be tried together. There are exceptions, and we've identified four circumstances in which it makes sense to do that. One, that is to say, where the severance may be required in order to address the problem of potential prejudice. We've identified four. The first is where the defendants rely on mutually antagonistic defenses. We don't have that, right? To an extent, no, sir, we do not. Second, where one defendant would exculpate another in a separate trial but will not testify in a joint setting. We've seen lots of those. It was a regular kind of thing. Jones says, I'll testify for Smith, but I'm not going to do it in the same trial. We don't have that, right? Third, where inculpatory evidence will be admitted against one defendant that is not admissible against another. We don't have that here. We have only exculpatory evidence as to one of the four. And fourth, where there's a cumulative and prejudicial spillover effect from stuff that's more culpable as to or relates only to one fellow but not the others. But so this is most unusual. I was unable to find a single case where the evidence being offered by one defendant was purely exculpatory in nature and that that would yield a claim of real prejudice in the case. Is there anything that, and I didn't see it in the briefs, but maybe I missed it. Is there any case out there that's sort of like this, where the evidence is purely exculpatory in evidence and you say the very exculpatory nature of the evidence tends to have a prejudicial inculpatory effect on the others? I'm not aware of that. And if I, on that thought, if I can join her. Sure, you sure can. On that particular issue, on joining her, joining her is for judicial economy and the should not be at the expense of individual defendants. No, I agree, but it's not just judicial economy. One of the reasons, counsel, for the joinder rule is that there's a risk if you have eight defendants, and Lord knows we used to have 18 in Miami where we were trying these drug cases. You tried it 18 times, the risk of utterly inconsistent verdicts from multiple jurors was very great, and Jones would wind up convicted, and on the same corpus of evidence, Smith would be utterly acquitted. And there was just a sense that there's a powerful reason that like-minded defendants ought to be treated in some corporal sense in a like-minded way. So it wasn't just for the convenience of the court, because I don't find that a terribly compelling reason not to sever if there's real palpable prejudice. You follow what I'm saying? Your Honor, permit me on that. Sure. In the rule, and this is critical, in the rule, and for two points, that the court can provide any other relief that justice requires by twice move to sever or to keep the polygraph evidence out. In this particular case, Mr. Angulo, his counsel offered to go simultaneous track, non-jury, all the same witnesses, all the same evidence. He stipulated, he agreed to stipulate to all the evidence except for knowledge, and the lower court said no. That was a perfect solution, a reasonable solution, so we wouldn't even be here arguing this particular issue right now. And that is right in the rule to anything that justice requires, the court could have fashioned that. That was such a simple solution to do so. And again, especially with the co-defendant willing to do it. Last point on that, if I may, Your Honor. This would be classic burden-shifting, absolutely burden-shifting to have Mr. Cecil or the other defendants without a polygraph suddenly have to make their case because he did not testify. Why didn't he testify? He didn't have a polygraph. That is classic burden-shifting. In my experience, it would seem— The judge did not tell the jury that you've got to take each defendant singularly and alone and consider the evidence as to that defendant, and the fact that you may find another defendant guilty or not guilty doesn't answer, yield, or generate an inference as to whether the government's met its burden beyond a reasonable doubt as to this defendant. Didn't the judge tell them that in substance? Of course, Your Honor. Spillover is the word you used previously. That is a fact. It was a spillover from a disastrous testimony of the co-defendant, Angulo. That is no question. It destroyed what—my case, at the very least, and yes, indeed, the instruction. I only speak from experience of this many jury trials. Jurors are human, and I know what they were thinking. You could see it on their faces when he was testifying, Angulo. It was the death knell for my case, for my client. And my client, no physical evidence, no admissions, nothing. And this polygraph examiner, he shouldn't be the guinea pig in something, as the judge claimed, novel, unusual. Let me ask one other question. You've gone over your time, but you're answering all questions, and you did not—you don't have any rebuttal time, so I want to just ask you one other thing. The other argument you make is that you had a right to be at the hearing. This is—yes, sir. I would defer to— Thanks very much. Thank you very much. Good morning, if it pleases the Court. I'm Joe Hosepi, and I represent Mr. Bill Balvarala. Judge, I will start by addressing the issue with the right to be present. First, I will make the argument—the government claims that it was simply a factual hearing. It was not a factual hearing. There was expert testimony taken, and it was of a fact of— Right, but you—the only stake that you have in it, it seems to me, is the stake that your brother has just outlined, that the effect was prejudicial. But other than that, whether the Court was going to allow it in as to one defendant or not, singularly concerned that you couldn't have gotten up at the hearing, could you, and have said, Judge, the foundation is insufficient for this polygrapher? Well— You wouldn't have had any standing or stake in challenging the bona fides of the polygrapher, would you? As opposed to saying what he just said, which is if you let it in, it's going to have a spillover prejudicial effect on us. I understand that argument, but I don't understand where you have a stake in or a right to be present at a hearing where he's simply saying, with his collateral hearing before the trial, whether this evidence can come in or not, other than to say, if you let it in, it's going to affect us in this way, that way, or the other way, as opposed to it's admissible or it's inadmissible with respect to the proponent. Do you follow what I'm asking? Had we been allowed to participate in what would be a novel type of factual hearing, we would have been able to cross-examine the expert who basically provided testimony that convinced the trial judge that this evidence, this junk science, was real, first of all, and second of all— You say junk science, but the United States Court of Appeals for this circuit has said many years ago that under certain circumstances, polygraph evidence may be admissible. It's limited, there are certain conditions, etc. You may characterize it as junk, but the Court of Appeals does not agree with that characterization. And the circumstances in this case is based on my opinion. So the prejudicial factor that the judge was considering, she did not have the benefit of our argument in being able to elicit expert testimony. First of all, the hearing that was conducted, the polygrapher that testified at trial who conducted the polygram was not the witness that testified at the hearing. You think you had standing to say at that hearing in opposition to the position of the co-defendant who was the proponent of the polygraph evidence, don't let it in because the polygrapher is no good, the foundation is insufficient? Not necessarily, but they— And bear with me, what could you have said other than that which he's already said, which is that it's prejudicial? And we would have been able to further demonstrate and expand on specifically why it would be prejudicial and how the various effects of that polygraph would affect my client. What's the basis, just so I understand, for your contention that you had a right to be present at the hearing? The basis that it was a critical stage, that it was a factual basis on a novel issue of law that's not well decided. Within the meaning of Rule 43? That and the confrontation clause. And so— Being able to confront this witness. Tell me if I'm wrong about this, I think I recall reading, not that it's binding, but that the advisory committee notes that 43 doesn't apply to pre-trial hearings. I don't think it's 100%. I think that there can be situations, if you want to simply pigeonhole it as just being a routine hearing, sure. But this was no routine hearing. This was a hearing on a novel issue of allowing a polygraph for one defendant and not the others, and the three others had no say. At least let us say, at least invite us, at least let us listen to the hearing. We weren't invited, we weren't notified. When the trial went forward and the polygrapher was called by the co-defendant, did the court bar you from cross-examining the polygrapher? It was not the witness that testified at the evidentiary hearing. The witness that testified— But I understand that. When they, the proponent of the polygraph evidence, at trial, got up and said, he told us the truth. Basically, as best I can tell, that's all he said, as opposed to detailing how, what, where, for, why. But holding that aside, were you barred in any way from confronting and cross-examining at trial the co-defendant's expert? Not legally, but statistically. No, no, no, I'm not— Legally, obviously not. I understand why you might choose not to, but that wasn't my question. My question is, if you chose to speak and inquire, the court didn't, and nobody objected to you being able to do that, right? That's correct. But the polygrapher's, and this is where I would say we have an issue, and I think it was something that was raised with the other argument. You said mutually antagonistic defense. Well, we did have, to some extent, what turned into an antagonistic defense, because Mr. Angulo's counsel had told the jury from the beginning, I'm going to prove to you that my client is not guilty. This polygraph, I look at this polygraph as essentially a manufactured affirmative defense. It's not simply, as the government calls it, potentially rehabilitative evidence. No, it's a manufactured defense saying, I'm telling the truth. I'm not lying. I didn't know about the drugs. You have to believe me. I have one question about procedural posture. Did you raise this issue in the trial court, or are we reviewing this only for plain error? I'm sorry. I'm not aware of this objection that your exclusion from this hearing was raised in the trial court to the district court. It was not, and I characterize the argument as, very simply, raise your hand if you're not here. I wasn't there. I didn't know. No, no, no, but I knew by the time you got to trial and at the time when the polygrapher was offered. Just bear with my question, please. You knew at that point that there was a hearing. Absolutely. Did you object to the trial judge at that time and say, in words of substance, judge, you ought not to allow the polygrapher to testify because, A, we had a right to be present at this pretrial hearing. We have a stake in it, and we wanted to be able to interrogate the polygrapher before you ruled on admissibility or severance. Did you say any of that to the judge? Specifically, no, but I think that argument is incorporated in our continuing request to sever the case. Now, also, what's very important is we were led to believe that the witness that testified at the hearing, who's a polygraph expert, he did not do the polygraph. He was the mentor of the polygrapher. He was also supposed to testify, but due to numerous pressures of the trial, multiple defense or whatnot, he never was allowed to testify, and the polygrapher who conducted the polygram was put under enormous restrictions. That would bring me to the fact that this evidence being inculpatory, I think this evidence was not inculpatory of the polygraph. I think that evidence was not inculpatory. Angulo designed it to be exculpatory. He wasn't putting somebody out to hurt him. Your argument is, but it hurt us. It hurt us. It hurt him, quite frankly, and I think he was prejudiced. Let me ask the question. We've gone over the time. Let me just ask it in this way. Beyond the argument of prejudicial spillover, which he has well articulated, is there something else or different that you're trying to tell us that I'm missing? I think the dynamics of the polygraph and the dancing around how we were going to do it, how it was going to be limited, et cetera, overall, from a procedural standpoint, limited our defense and also limited Mr. Angulo's defense by having us to combine them based on the novelty of the issues without... Right, but that all falls under the rubric of prejudice, if I have that right. I think it's the totality. But it's prejudice that you're complaining about here. Prejudice and confrontation. I never got to confront the witness that convinced the judge that this wasn't going to affect my client. Got it. Thank you very much. Thank you, Your Honor. Good morning. May it please the Court, Counsel. I would like to focus, Shea Lepardo, on behalf of Captain Acosta, on the impact this had with the polygraph in this context. Because I discussed this with several other attorneys prior to the trial and said, hey, this is going to come in. And they kind of looked at me like, why on earth would you do that? So to me, the context is, well, first of all, if the one guy takes it, then why didn't everybody else? So it's kind of like you have a consciousness of guilt because you didn't take the polygraph. I mean, that's just one way to look at it. The other one could be, well, perhaps he was the only one that passed. Everyone took it. He's the only one that passed. Or maybe he was even put up to. Of course, the irony is it meant nothing to this jury. It didn't help the proponent. I understand Your Honor's point. But you're saying, nevertheless, it would have hurt you anyway, even though they didn't believe it for a minute. Well, it's the implication of the consciousness of guilt. It's so prejudicial that you can't avoid it. It's just there. And the fact that I would say that it poisoned the jury to even have it because they might have actually thought, well, he's the only one that passed it, so let's put him up to testify. Can I ask you a question just so I've got the defendant straight? Did you properly preserve this objection in the trial court? Which one? We're talking about the severance for the polygraph, right? Is that what you're— Yeah, I made several motions. I thought there was a motion that was made—tell me if I'm wrong about this—but by Mr. Lopez that Mr. Acosta did not join that motion. I believe we actually did join that motion. Okay, I'll check that. I'm sorry about that if I've got that wrong. And we made the motion several times. We're talking about now the motion to sever. Sever, correct. So whether there's a spillover or not, I mean, when you're sitting there and the one guy may have passed it, then the jury may look at us like, you know, hey, these guys are trying to really pull one over on us. You know, that's the other effect that it has. You don't know unless you're sitting there at the trial. It's kind of like, you know, he obviously didn't believe polygraph. That's obvious. Or Mr. Dula would have been— By the way, let me just ask one other question. When the polygraph evidence came in, did anyone from the defendant's side, the three non-proponents of the polygraph evidence, ask the judge for any instruction, any limiting instruction? This is evidence that bears on Jones, not on the other three, and you can't consider it in any way, shape, matter, or form because if you did, I may have missed it. At the time, someone says, judge, give us an instruction, a limiting instruction. Yeah. When it came in, did somebody say, listen, we object because we think there's a spillover effect, but as a fallback position, we want a limiting instruction? I don't think so either. I just wanted to double check that. Thank you. And can I—so go back and check because what my notes are showing is that when Mr. Lopez made the motion—did you try the case for Mr. Acosta? Yes. That you said that you didn't think severance was the most practical remedy and that you sought to exclude the evidence instead. And Mr. Varela's attorney said that he agreed with the government that severance was not required. This was Lopez's motion. You said, I don't think severance is necessary. I think it's necessary. I hear we're only talking about severance, right? So I could be wrong, but I think you might have walked away from this argument in the district court by exceeding, in essence, the notion that severance wasn't required and that it was not necessary. I would have to check the record, Your Honor, but my recollection is that, along with Mr. Liebling, we made several motions, contemporaneously, to sever, even probably on the day of trial. That argument was probably made for argument purposes, saying, you know, don't sever us, but please exclude the evidence. So I may have mentioned that for the sake of argument. Thank you. Thanks very much. And you have reserved four minutes for your rebuttal. May it please the court, counsel. I'm Chris Kerr on behalf of Jesus Angulo Mascara. The government denied Mr. Angulo Mascara... Do you want to say anything about severance? I suppose not, but... Well, I'd be happy to answer any of your questions about that, and I'm actually going to touch on some... Let me ask you a question on severance. They weren't present at the hearing. Did they have standing to challenge your right to put a polygrapher on? First, you know, I have not researched that issue, but I believe they had a... They can argue severance and spillover. I'm not asking about that, and they've well and vigorously argued that. But did they have standing to come in to the district judge and say, in words or substance, don't allow the polygrapher in, even though the co-defendant wants him, because we think the polygrapher isn't sufficiently competent or qualified in the area of expertise, and therefore his opinion is no good, or it amounts to junk science in this case. Could they have said that? Yes, I do believe they could have. They could have challenged the... Polygrapher. Polygrapher's qualifications and the test... At the time of the trial, when you offered the polygraph evidence, did anyone get up and challenge it? No. I mean, did any of the co-defendants say, judge, don't let this in because the witness is no good. He's otherwise not competent. Or his opinion isn't well-grounded in the science. No, Your Honor. Okay. You've been answering my questions fire away. I didn't mean to interrupt your flow, but I just wanted to be sure that I had what happened correctly. Thank you, Your Honor. In my limited time, I'm trying to focus on two issues. The withholding of important discovery, and the prosecution's finishing Angulo's cross-examination by making an unfounded, inflammatory accusation that he was the boss of this huge smuggling venture. And I believe that these errors prejudiced Angulo to the extent that they completely overwhelmed any value of the polygraph. First, the government admittedly withheld a 1998 Homeland Security report from the defense until after Mr. Angulo chose to testify and did testify on direct. During cross-examination, the prosecutor displayed a report, a withheld report in front of the jury, read from it to ask questions about the drug quantity, and then pose a highly prejudicial question about supposed line-throwing guns and other equipment for at-sea transfers of bales of cocaine from the ship from 17 years earlier. But no, your client didn't answer the question, correct? Your client didn't answer the question. There was an objection raised before the answer came out. That's correct. However, my position is that that was immaterial because the prosecutor did this in such a way, in front of the jury, reading from this report that was withheld, that it was clear to the jury, it appeared, that the government had this information. I objected, we asked for a sidebar, and then she kept out any further comments from that report. I think the damage was done because in this sort of situation, Mr. Angulo had, his testimony was the main event of the trial, this two-week trial. They were all on the edge of their seats listening for this testimony, and that was extremely damaging to him. Second, the government ended its cross-examination by accusing Mr. Angulo of being the load guard, which is the boss of this entire operation. If I understood what happened, and help me if I've misapprehended the record. The prosecutor gets up when Angulo is on the stand, on cross-examination, and says in substance, let's talk about February 18th, 1998. Yes, sir. You are on the motor vessel Sea Star 2. Is that right? Yes, sir. And then a little later in the colloquy, he says, and also on the vessel with 2236 kilograms of cocaine, right? Correct. And there were a lot of line-throwing guns and polypropylene lines to be used. Was that the offending? Yes, Your Honor. Okay, at that point, you say, may we approach the sidebar? The judge says, sure. And at that point, the question came up of what was disclosed and what wasn't in discovery. And the court determined that the prosecutor was working from an undisclosed 1998 report of the incident, but some of the information regarding the incident had in fact been disclosed, but this particular question, or what elicited this question, was not disclosed. So the whole thing boiled down to one question, never answered, sustained. Do I have that right? That's the essence of what we're talking about. Yes, Your Honor. The government does an excellent job of trying to minimize the impact. I'm not saying it's not significant, or it is. I just want to know what it is. That is correct. I see that my time has... No, that's all right. I had another question for you while you're here. There was also the other incident about, weren't you on the vessel to ensure that all the drugs were going, the quote, load guard question, in addition to the one that Judge Marcus was just talking about. Right, and I think the prejudice from both of these things completely overwhelmed any benefit from the polygraph. Can you answer a question that I ought to know the answer to? So I know that there were eight people from this ship that were indicted, four pled guilty. Was that the total crew on the ship? Yes, Your Honor. Okay, all right. And my recollection is that it took the Coast Guard 17 hours worth of searching to find... Yes, Your Honor, 17 hours to find the patch and then find the drugs. And then finally, this case was mistried the first time, right? Yes, Your Honor. Same four defendants, okay. All right, thank you very much. Anything, you've reserved five minutes, but anything else you wanted to say before we got to your rebuttal? On the load guard question, the government at all stages totally ignored the post-trial expert, a very qualified expert that I submitted a declaration... When you say ignored, that came in, right? It wasn't barred from receipt. He just, the judge just didn't give it much weight. The government never responded to the expert that completely debunked this idea that... No, no, but my question is, it came into evidence. Yes, Your Honor. It was received by the court. Yes, Your Honor. Thank you very much. May I please the court? Karen Hottman for the United States. Your Honors, I'm going to go over a couple of points for a moment about the severance motion. Your Honor had asked about limiting instructions. There was not a limiting instruction requested, and in the final jury instructions from the court, there was not just one, but three instructions that would have solved any problem of, quote, jury speculation on this issue. Those were the individualized... Of course, asking for a simultaneous instruction, I mean, that could be a strategic decision. I mean, the lawyers could decide, well, we don't want to call any more attention to this train wreck that's about to happen for us, right? It could, Your Honor, but that could have been done beforehand as well, and it could have been done by motion submitted to the court before the testimony was made. Well, they say that was the purpose served by the motions for severance. Absolutely, Your Honor. Based on the polygraph. And to address the motion for severance, Your Honor is correct about the walking away with the original motion. However, I would expect opposing counsel to point out that all counsel at some point made numerous, I adopt all motions, I adopt all objections. So you might be able to find something in there. So do you think you would agree with them that it's fair to say that they properly preserved the severance objection? A whole bunch of them, three of them. I don't believe that they preserved it for the motion to sever beforehand. They may have preserved it after. Was that sufficient? Are you saying that they gave up that or they properly preserved a severance motion? Oh, the two defendants who brought this up and who argued it in their brief certainly properly preserved that, Your Honor. I was trying to respond to Judge Nielsen. So that's a practical matter. We don't have the problem. While it may not have been raised on the front end, by the time you got into the hurly-burly of the trial, they were objecting. Absolutely, Your Honor. They were all saying we want to be severed from the defendant offering polygraph evidence. I don't know that the third defendant did, Your Honor. I was pointing out that. Well, that's what I'm asking. Is that an issue or isn't that an issue? It's not an issue for us and we did not respond to it and I don't have a site to say that they raised it. So I can't speak to whether this would be plain error on that defendant's part. I would assume that somewhere in the record they would be able to provide, Your Honor, with another objection. And I was trying to point out that because this was a multi-defendant case, there were several of those statements made beyond the original motion. This was an issue that was fought out before trial. Most of these issues, in fact, all of these issues stated in the opening statement and oral argument were thoroughly fought out before trial and there are orders on each and pleadings on each. None of this came up at trial except for the questions on cross-examination which also related to things that had gone on before trial. You know, Ms. Hoffman, I think, you know, one of the purposes of oral arguments is for judges to share with you their concerns about the case. So, you know, I was a prosecutor myself and there's this, what happened here just leaves me feeling bad about the conviction, the convictions. First of all, I mean, it's a close case. It goes to trial the first time there's a mistrial. So the government thought notice that there's some, you know, jury, I mean, presumably you had interviewed the jurors from the first trial. But anyway, there was, they couldn't reach an agreement to convict. Then, you know, we've got the Rule 16 violation and the Electoral Circuit has clear case law about where a defendant's been given discovery material. They rely on that discovery material to make their strategy, their trial strategy. And then the government comes in with some undisclosed document that's harmful. You know, that, we sent, you know, several cases back on that rationale that the defendant had a right to rely on the provided discovery material in making their trial strategy. I know this is a long question, but you've got 20 minutes almost. And then the second concern is this Lodegard question. And I know, you know, the argument about that as well, the witness never answered the question. But I mean, the way I read the transcript, the question is asked by the Assistant United States Attorney. There's an objection and immediately the Assistant United States Attorney says, no further questions, Your Honor. So that seems to me to demonstrate that he didn't really care about the answer. He really just wanted to ask the question. Okay, and then third, and I really am going to let you talk. And then this whole display of reading the agent's report in the cross-examination of Mr. Crespo-Mirren under the guise of, well, this is a total, I mean, a completeness doctrine when it really wasn't Mr. Crespo-Mirren's testimony at all. You know, just the cumulative effect of all those things just leaves me feeling, you know, like, worried about the outcome of this trial. Thank you, Your Honor. First of all, if we are skipping to prejudice, we would have to put this in the context of the entire trial. And I would point out that, for instance, Your Honor brought up something that was not brought up in opening about the supposed display of an agent's report. Defense Counsel has specifically stated that that did not cause prejudicial error by itself. There are several questions that Your Honor is worried about. The District Court's handling of any violation of its Rule 16 order concerning one piece of evidence, and then the single question or questions about the load guard. So I'll certainly address those. As far as the Rule 16 order, Your Honor, there certainly was evidence given, and it's not disputed that Defense Counsel had in their hands the evidence leading to this objection. They didn't have the 19th? Your Honor, we don't have the report either because it wasn't put into the record at any point. So it's very difficult for me to respond to this objection. But you're not saying you didn't have it at trial, are you? I'm saying we had the text printout that said the same things that were on the handwritten log. But we don't have it today because y'all didn't put it in evidence. Well, we weren't the ones who put it in the report because they were discussing that in their reply brief. So again, we are talking about, though, one specific question which was not answered. And the district court at sidebar had a thorough sidebar about this. She apparently looked at the report because she said you can ask anything that's not on there. And in the record is exactly what was on what they did have. So if we're talking about a Rule 16 violation of the court's oath of cocaine, which everybody knew about and was asking about beforehand or at trial, we have a question about throwing lines. So help me with this. And this is my ignorance of throwing lines, I guess. How is it that the single question would have changed trial strategy? And maybe this is a question better put to the other side. But if they knew about the arrest, they knew about the amount, what they didn't know about was throwing lines, how is it that that would have affected trial strategy? I mean, I think this has to be a trial strategy objection because it's not an objection to an answer that was never given. That would be the question that we have as well, Your Honor. And I believe we covered that in the brief. The argument would have to be that  that there was cocaine seized on this boat and 2,200 kilos of cocaine seized on this boat, and the district court specifically turned to defense counsel and said you need to tread lightly with this information because the prosecutor has stated he will not bring it up in case in chief. And my 404B ruling is based on that stipulation. I'm not making a ruling as to impeachment or any other use. Tread lightly. So despite all of those warnings and the decision to put the defendant on the stand and to ask specific questions about the 1998 incident, but also did you ever hear of cocaine on that boat? Did you ever see? Despite all of those decisions, the argument would have to be if they knew that the prosecutor also knew in addition to the kilos of cocaine there were throwing lines, that decision would not have been made to put him on the stand. I think that is not a logical argument to make, but it's the one that they would have to make. The other potential error here, and again, what happened before, what happened below, the accusations against the prosecutor, etc. When we're on appeal, of course, we look to see what the district court's error is. And finishing my response to your Honor's question about the Rule 16, the other error that would have to be argued here is that the court, despite solving this at sidebar and despite excluding the evidence based on Rule 16, abused her discretion in enforcing her own order by refusing to go farther on her own. I think that's also a very difficult error argument to make. So they would have to get through both of those to make anything of this one question. Now, Your Honor, in response to the low guard question, we would point out, as we did in our brief, that we are not talking about 608B or 608 character evidence. We are not talking about anything that we introduced that was not in the record. What we are talking about is a question for the jury that drew an inference based on evidence that was already before the jury. We had in the record, of course, the statement about you don't know who I am. We had in the record already three witnesses testifying that Mr. Angelo was involved in this and that he had actually used the crane to load the cocaine. We have what I call a lot of other tidbits in the record that we did not harp on in closing argument but that pointed to his involvement in this conspiracy. When the prosecutor asked that question, he was not asking were you involved in this conspiracy even or did you load cocaine? What he was asking was weren't you the load guard? Weren't you the one in charge at some point because of all this evidence over the cocaine? We would submit that that is extremely, it is very, very far removed from any of the cases cited in defense counsel's brief. I'm not picking up on any idea that maybe the prosecutor overreached at all in any of these instances. Your Honor, this was a week long. We'll do better next time. Your Honor, if you could point me to the specific instances of overreaching besides the two that I just addressed. The three, the three. I'm sorry, the load guard which was an inference drawn from the evidence which was certainly a good faith basis and the Rule 16, which was stated, it was stated that that was an oversight, if at all, and I'm sorry, the third was the issue of, that's an extremely difficult issue to address, Your Honor, because it's very much a moving target. Although there were 20 pages of transcript devoted to why the agent should not be able to hold the report or ask the interpreter to read the report in Spanish first, there were only, I believe, three pieces of actual information that was put before the jury based on that. Again, the District Court did a very thorough job of addressing all the objections which were moving objections. Most of the objections were that this is improper leading or that this could not be used at all and the District Court made the original ruling on completeness grounds from what she had seen in the courtroom. She said, you've used this report up here and I'm going to allow them to use this report. Did any of those three pieces of evidence or questions occur at the first trial? Oh, Your Honor, all of these questions occurred at the first trial and that was precisely defense counsel's strategy. That's why this was so difficult when going into inconsistencies. How can they be making the argument that at the second trial they didn't know about the report if you had introduced it at the first trial? I'm sorry, I'm speaking of a different piece of information. My point is, again, these people on trial before the jury could not reach a verdict. No, Your Honor, it's not that they could not reach a verdict. It was mistried from the District Court as a question to the agent. Why was it mistried? It was mistried because an agent was being questioned at length about video evidence and videotaping of confessions, Your Honor. I'm granting it, it trenches on that Fifth Amendment. Mistrial declared, no jury verdict, round two, suit up, new trial. Correct, Your Honor. And that was at, I believe, that was towards the end of what would have been the evidence that was the same evidence put in. I think it was about five days. Tell me about the severance, which is the central argument that three of these defendants make. Your Honor, there's no logical connection between the request for severance and any prejudice. As Your Honor pointed out, any speculation, or excuse me, as I was pointing out in response to Your Honor's question, any speculation on what the jury might or might not do with this polygraph evidence was taken care of by the standard instructions in the case, which were in this case, number one, that it would be individualized assessment of the evidence. Number two, any statement that came in would be used only against the stater. And then number three, of course, the instruction that should anyone not decide to take the stand, that cannot be used against them in any way or even considered. The jury had three instructions that prevented them. It made it not perhaps impossible, but improper to consider any of this polygraph evidence against anyone else. Number two, this of course was not evidence that we introduced. It was rehabilitative opinion character evidence. This court, in its on-bank decision in Pichinona, specifically stated that that was the use that polygraph evidence could be used for. And the district court made a proper Pichinona order here, limiting the use of this evidence. So all that this evidence was going to be used for and all that it could be used for under law was opinion character evidence rehabilitatively. We submit that that is much, much too far removed. Help me with what actually was produced by the defendant. What did he put on and what was said? Regarding the polygraph? Yes, ma'am. The defendant. One moment. May I grab my trainer? Sure. This is the entirety, Your Honor. It's document 499 on page 88. I want to ask, this is a question from defense counsel and the answer from Mr. Angelo. I want to ask about the polygraph test you took. Answer through interpreter, yes, sir. Question,     Question, did you tell the man you took the polygraph test? Answer through interpreter, yes, sir. Question, did anyone force you to take the test? Answer, did you tell the man who gave you the test pretty much the same story you told here? Answer, through interpreter, yes, sir. Question, before you took the test, were you told about the qualifications of the man who was going to give you the test? Answer, through interpreter, yes, sir. Question, did you have any trouble answering the questions? Answer, no, sir. Did you pass the test? Answer, I believe so. Let me put my question again. Beyond the defendant being asked, then the polygrapher himself, what was he asked and what did he say? He was asked a series of questions. There was no cross-examination for that. I'm not asking about the cross. What was induced on direct evidence by the proponent of the polygrapher for rehabilitative purposes? What was asked and what was said? Just tell me in substance. There was, Your Honor, what was asked and said was how a polygraph is given, the science behind a polygraph, exactly what the physical setup was of the room, and a video was introduced of how to take a polygraph, not of Mr. Angelo. But what was asked specifically about the results of the polygraph evidence that was administered to this defendant? One moment, Your Honor, because I don't believe there was anything asked of substance because of the court's order. So there was no opinion offered by the polygrapher? The only opinion came from the defendant? That's what I'm checking, Your Honor. There was a series of questions, Your Honor, asking about whether he employed countermeasures or whether he was truthful. There were no questions, and I'm sorry if I'm misunderstanding Your Honor's question. I'm talking about the polygrapher. He was called by the defendant as a rehabilitative witness. Was he asked, in words or substance, one, did you box the guy? Two, what did you learn? What were the results of the polygraph? Yes, Your Honor. On page 137, et cetera. Does he offer any expert opinion about the results of the polygraph administered? He says he was truthful on the polygraph. Yes, Your Honor. Does he say what questions he was asked and what manner he was truthful? No. So he's just asked one question about the proceeds of his test. Was he truthful when he answered your question's answer yes? Was that the beginning, the middle, and the end of the answer the polygrapher gave? As far as opinion, yes, Your Honor, because the court... Other than having said here's what a polygraph involves and here's the methodology and the regime, I'm just asking about the opinion offered about Angulo's test. Yes, Your Honor. It was a pure opinion of credibility and character, which is what is under Pichinona, which... No, no, I know what Pichinona says. I'm sorry. We're talking across purpose. We are, Your Honor. I think you might be... So bear with me. Let me try it one more time. Thank you. I simply want to know what opinion this expert gave about the defendant's truthfulness. What did he tell the jury? Yes, he was truthful generally, or did he say I asked him a question A, B, C, D, E, F, and G, and his answer was truthful as to each of A through G? No, for the latter. He did not give any particular questions or particular answers per the court's order. So he simply opined that the man was truthful, period. During the test, yes, Your Honor. Okay. Tell us why you don't think there's prejudice that adheres in this process, even accepting that the guy didn't say a whole lot. The process... The fact that the defendant was willing to be boxed was polygraphed, and the polygrapher says he's telling the truth. Does that lead to an inference that these other folks who were offering no polygraph evidence really had something to hide? And so they were afraid of a polygrapher, and therefore the jury was naturally left to infer from their silence their culpability. That's the argument. That's the argument, Your Honor. The jury would have to go through three inferential steps, each of which was nullified by the or countered by the jury. So take me through the three steps. They would have to say that the jury would infer that this person could have gotten on the stand themselves and defended themselves. I'm talking about the people other than Mr. Angelo, the other defendants. They would have to infer that they could have not only taken a polygraph test, but did take a polygraph test. They would have to infer that the reason that they did not take the stand was because they failed the polygraph test. They would have to infer that they failed the polygraph test. And apparently they would have to infer only as much as was in evidence from the opinion, the character opinion, which was that they were not truthful during the polygraph test as opposed to any particular questions. So they would have to infer all of that in order for them to there to be any problem with Mr. Angelo using the opinion, character evidence of his truthfulness during the test to rehabilitate himself or corroborate himself as it appears that they did on direct examination as to his credibility. Your Honor, I was a bit concerned that I did not answer Your Honor's questions fully about prejudice. Do you have any more specific questions of prosecutorial problems? Thank you, Your Honor. And again, we'd point out that the district court did address each of these, especially the agent's report, which I did not hear in opening, but there are many things that could be said about that report, were said about that report, and that were resolved by the court. Again, although there was much discussion over it, the only things that came in were consistent statements with what that witness had already testified to, and a single statement or single set of statements that he had seen Mr. Angelo get an anticipo. There were three other witnesses who said that or said something to that effect, who said that he had a $25 million, who said that he talked to Mr. Varela on the boat about $25 million. So that was extremely redundant evidence at that point, and that's the only thing that the jury thought of this entire agent report objection. Your Honors, I did not hear anything else on opening statements other than what Your Honor brought up and what I've addressed. Do you have any other questions before I sit down? Thanks very much. Thank you. Mr. Hovzapian, you are reserved two minutes for rebuttal. Yes, Your Honors. The inferences that the government refers to, three inferences that the juries would have to make to in effect have this prejudice, are so natural and so instantaneous and so basic that the government in their brief on page 19 essentially makes that argument for us where they say, and quote, no defendant other than Angulo opted to take the polygraph or testify. Essentially, ensuing that the complaint we're making is of our own fabrication because our clients didn't take a polygraph and our clients didn't testify. Essentially, suggesting that the clients would have cured this problem if they would have taken a polygraph and they would have testified, essentially shifting the burden and basically stripping them of their Fifth Amendment rights. So, I think these three inferences are instantaneous and are so bold that clearly a jury is going to make those inferences in this case. This is a unique situation. And you think the danger of prejudice is not obviated in any way by virtue of the fact that they obviously disbelieve the defendant and the polygrapher? That this exculpatory evidence came to nothing with respect to the proponent? And you think that has no bearing on whether or not the other three were prejudiced? I think the polygraph evidence was so limited and the prosecutorial misconduct was so prevalent What was the misconduct? The improper cross-examination by Mr. Ruddy. The court had asked to give some other specific examples. I agree with you that it is very unusual polygraph evidence because usually when you put a polygraph on a case you will say here's the regime here's what we do here's the foundation here's what we asked ABCDE and the  truthful untruthful or I can't tell. And this is odd because all he does here is he said we asked a series of questions we got a series of answers and he was truthful. Period. No explication of what where for why or how which really undermines if I were the proponent of the polygrapher you bet I'd have asked in detail A through Z and had him say yeah he was telling the truth about this he said that the polygrapher was shooting with a mouse rather than a cannon. Maybe I've missed that. The limiting of the factor of the polygraph essentially reduced the polygraph evidence to very poor evidence and a poor attempt at the defendant to deceive the jury therefore the jury looks at him and says you got this guy who you put up to this test that he passed to say he's not lying they're not lying either. The failure in the polygraph was key. I wanted to briefly address Well you really have gone over your time so I'll give you really just make it short because I'm way over. As far as the issue being properly preserved as to my defendant. The issue being severance. Tell me where you preserved it that would be helpful to me. On several occasions I'm sorry I cannot give you the siding. In the trial you preserved it. Prior to that evidence prior to Mr. Angulo's testimony prior to the polygraph evidence it was preserved. The motions were joined. We asked for severance. We asked to block the evidence all together. We asked for a special instruction limiting the jury specifically as to the details of the polygraph toward our other clients. Those were all rejected. I apologize I can't give you a site because I have everything electronic. The bottom line is that you have to have a special instruction limiting I apologize  give you a site jury specifically as to  other clients.    I other clients. I apologize give you to other clients. I apologize give you a site because I have everything electronic. The bottom line is that you have to have a special instruction   specifically as to apologize give you a  I have  as to  clients. I apologize give